Miles N. Clark, Esq.
Nevada Bar No. 13848
LAW OFFICES OF MILES N. CLARK, LLC
5510 S. Fort Apache Rd, Suite 30
Las Vegas, NV 89148
Phone: (702) 856-7430
Fax: (702) 552-2370
Email: miles@milesclarklaw.com

*Local Counsel for Plaintiffs*
*Additional Counsel on Signature Page*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| CHARLES POPP; JOHN GEDWILL; and VIRGINIA STACY, individually and on behalf of all others similarly situated, | Case No.: 3:23-cv-00633 |
| Plaintiffs, | **CLASS ACTION COMPLAINT** |
| v. | **JURY TRIAL DEMANDED** |
| VICI PROPERTIES INC.; and CAESARS ENTERTAINMENT, INC., | |
| Defendants. | |

Plaintiffs Charles Popp, John Gedwill, and Virginia Stacy ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this action against Defendants Vici Properties Inc. and Caesars Entertainment, Inc. (collectively, "Caesars" or "Defendant") and allege as follows based on personal knowledge as to their own acts and on investigation conducted by counsel as to all other allegations:

### PARTIES

1.     Plaintiff Charles Popp is a citizen and resident of Illinois.

2.     Plaintiff John Gedwill is a citizen and resident of Illinois.

1

3.      Plaintiff Virginia Stacy is a citizen and resident of Illinois.

4.      Defendant Vici Properties Inc. is a Maryland corporation with its principal place of business at 535 Madison Avenue, 20th Floor, New York, NY 10022.

5.      Defendant Caesars Entertainment, Inc. is a Delaware corporation with its principal place of business at 100 W. Liberty St. 12th Floor, Reno NV 89501.

6.      Defendant Vici Properties Inc., through its subsidiaries, owns resorts, casinos, and other entertainment venues throughout the United States, which are operated by Defendant Caesars Entertainment, Inc. Defendants, together and through their subsidiaries, collectively operate as "Caesars."

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d) because (1) the matter in controversy exceeds the sum or value of $5,000,000, exclusive of interest and costs, (2) the action is a class action, (3) there are members of the proposed Class who are diverse from Defendant, and (4) there are more than 100 proposed Class Members.

8.      This Court has personal jurisdiction over Defendants because Plaintiffs' claims arose out of Defendants' contacts with this district.

9.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this district.

//

//

//

## FACTUAL ALLEGATIONS

### I.  Caesars

10.    Caesars owns and operates resorts, casinos, and other entertainment venues throughout the United States.

11.    Caesars' guests and customers, like Plaintiffs and Class members, provided certain Personal Identifying Information ("PII") to Caesars, which is necessary to use or obtain Caesars' services.

12.    As a sophisticated hospitality provider with an acute interest in maintaining the confidentiality of the PII entrusted to it, Caesars is well-aware of the numerous data breaches that have occurred throughout the United States and its responsibility for safeguarding PII in its possession.

13.    Caesars represents to consumers and the public that it possesses robust security features to protect PII and that it takes its responsibility to protect PII seriously. Caesars's Privacy Policy states:

> We maintain physical, electronic and organizational safeguards that reasonably and appropriately protect against the loss, misuse and alteration of the information under our control. With regard to information that you transfer to us through one of our websites or mobile apps, please be aware that no data transmission over the Internet or a wireless network can be guaranteed to be 100% secure. As a result, Caesars cannot guarantee or warrant the security of any information you transmit on or through a website or mobile app, and you do so at your own risk. [1]

### II.  The Data Breach

14.    On September 7, 2023, Caesars experienced what it called "suspicious activity" which resulted in Caesars shutting down their networks systemwide ("Data Breach").

---

[1] https://www.caesars.com/corporate/privacy

15.     On September 14, 2023, the hacker group Scattered Spider publicly claimed responsibility for the Data Breach, claiming that it stole six terabytes of data from Caesars.

16.     To gain access to private data, Scattered Spider "uses social engineering to lure users into giving up their login credentials or one-time-password (OTP) codes to bypass multi-factor authentication."[2]

17.     Caesars provided information on the breach on a Form 8-K:

> As a result of our investigation, on September 7, 2023, we determined that the unauthorized actor acquired a copy of, among other data, our loyalty program database, which includes driver's license numbers and/or social security numbers for a significant number of members in the database. We are still investigating the extent of any additional personal or otherwise sensitive information contained in the files acquired by the unauthorized actor.[3]

18.     Caesars reportedly paid a $15 million ransom to the hackers but could not guarantee that the stolen data was destroyed.

19.     The Data Breach compromised individuals' name, driver's license numbers, and/or social security numbers.[4]

20.     Caesars did not publicly report how many individuals were affected by the Data Breach.[5] However, on information and belief, the number of affected individuals is likely in the hundreds of thousands or millions of individuals, based on the number of hotels, resorts, and casinos that Caesars operates and through which Caesars collects PII.

21.     Caesars did not state why it was unable to prevent the Data Breach or which security feature failed.

---

[2] https://www.reuters.com/technology/moodys-says-breach-mgm-is-credit-negative-disruption-lingers-2023-09-13/
[3] https://investor.caesars.com/static-files/0bc13ee5-34a9-402e-8e7a-824b9dba4e57
[4] https://investor.caesars.com/static-files/0bc13ee5-34a9-402e-8e7a-824b9dba4e57
[5] https://apps.web.maine.gov/online/aeviewer/ME/40/b21dc5d1-0bee-4a4c-92dc-bef4bbb519c9.shtml

22.    Caesars failed to prevent the Data Breach because it did not adhere to commonly accepted security standards and failed to detect that its databases were subject to a security breach.

### III. Plaintiffs' Experience

#### A. Plaintiff Charles Popp

23.    Plaintiff Charles Popp is very careful about sharing their sensitive PII and diligently maintains his PII in a safe and secure manner. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

24.    Plaintiff provided their PII to Caesars as required to obtain services from Caesars, including use of Caesars Rewards.

25.    Plaintiff received a breach notification letter from Caesars on or around October 10, 2023 (attached as Exhibit 1).

26.    Since the Data Breach, Plaintiff has experienced an increase in phishing emails and scams, including requests to change passwords for various accounts.

27.    As a result of the Data Breach, Plaintiff has and will continue to spend time trying to mitigate the consequences of the Data Breach. This includes time spent verifying the legitimacy of communications related to the Data Breach, and self-monitoring accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

28.    The harm caused to Plaintiff cannot be undone.

29.     Plaintiff further suffered actual injury in the form of damages to and diminution in the value of their PII—a form of intangible property that Plaintiff entrusted to Caesars, which was compromised in and as a result of the Data Breach.

30.     Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

31.     Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of cybercriminals.

32.     Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

33.     Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Caesars's control, is protected, and safeguarded from future breaches.

**B.  Plaintiff John Gedwill**

34.     Plaintiff John Gedwill is very careful about sharing his sensitive PII and diligently maintains their PII in a safe and secure manner. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

35.     Plaintiff provided his PII to Caesars as required to obtain services from Caesars, including use of Caesars Rewards.

36.     Plaintiff received a breach notification letter from Caesars on or around October 12, 2023 (attached as Exhibit 2).

37.    Since the Data Breach, Plaintiff has experienced an increase in phishing emails and scams requesting that he update passwords or send money.  In addition, since the Data Breach Plaintiff has noticed an increase in out of state calls from numbers he does not recognize.

38.    As a result of the Data Breach, Plaintiff has and will continue to spend time trying to mitigate the consequences of the Data Breach. This includes time spent verifying the legitimacy of communications related to the Data Breach, and self-monitoring accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

39.    The harm caused to Plaintiff cannot be undone.

40.    Plaintiff further suffered actual injury in the form of damages to and diminution in the value of his PII—a form of intangible property that Plaintiff entrusted to Caesars, which was compromised in and as a result of the Data Breach.

41.    Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of his privacy.

42.    Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from his PII being placed in the hands of cybercriminals.

43.    Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

44.    Plaintiff has a continuing interest in ensuring that his PII, which, upon information and belief, remains in Caesars's control, is protected, and safeguarded from future breaches.

### C.  Plaintiff Virginia Stacy

45.    Plaintiff Virginia Stacy is very careful about sharing her sensitive PII and diligently maintains her PII in a safe and secure manner. Plaintiff has never knowingly transmitted unencrypted sensitive Private Information over the internet or any other unsecured source.

46.    Plaintiff provided her PII to Caesars as required to obtain services from Caesars, including use of Caesars Rewards.

47.    Plaintiff received a breach notification letter from Caesars on or around October 19, 2023 (attached as Exhibit 3).

48.    Since the Data Breach, Plaintiff has experienced an increase in phishing emails and scams requesting that she change passwords.  In addition, since the Data Breach Plaintiff has noticed an increase in phone calls from different states from numbers she does not recognize.

49.    As a result of the Data Breach, Plaintiff has and will continue to spend time trying to mitigate the consequences of the Data Breach. This includes time spent verifying the legitimacy of communications related to the Data Breach, and self-monitoring accounts and credit reports to ensure no fraudulent activity has occurred. This time has been lost forever and cannot be recaptured.

50.    The harm caused to Plaintiff cannot be undone.

51.     Plaintiff further suffered actual injury in the form of damages to and diminution in the value of her PII—a form of intangible property that Plaintiff entrusted to Caesars, which was compromised in and as a result of the Data Breach.

52.    Plaintiff suffered lost time, annoyance, interference, and inconvenience because of the Data Breach and has anxiety and increased concerns for the loss of her privacy.

53.    Plaintiff has suffered imminent and impending injury arising from the present and ongoing risk of fraud, identity theft, and misuse resulting from her PII being placed in the hands of cybercriminals.

54.    Future identity theft monitoring is reasonable and necessary and such services will include future costs and expenses.

55.    Plaintiff has a continuing interest in ensuring that her PII, which, upon information and belief, remains in Caesars's control, is protected, and safeguarded from future breaches.

## IV.    Injuries to Plaintiffs and Class Members

56.    As a direct and proximate result of Caesars's actions and omissions in failing to protect Plaintiffs' and Class Members' PII, Plaintiffs and Class Members have been injured.

57.    Plaintiffs and Class Members have been placed at a substantial risk of harm in the form of credit fraud or identity theft and have incurred and will likely incur additional damages, including spending substantial amounts of time monitoring accounts and records, in order to prevent and mitigate credit fraud, identity theft, and financial fraud.

58.    In addition to the irreparable damage that may result from the theft of PII, identity theft victims must spend numerous hours and their own money repairing the impacts caused by a breach. After conducting a study, the Department of Justice's Bureau of Justice Statistics found that identity theft victims "reported spending an average of about 7 hours clearing up the issues" and resolving the consequences of fraud in 2014.[6]

---

[6] U.S. Dep't of Justice, *Victims of Identity Theft, 2014* (Nov. 13, 2017), http://www.bjs.gov/content/pub/pdf/vit14.pdf.

59.     In addition to fraudulent charges and damage to their credit, Plaintiffs and Class Members may spend substantial time and expense (a) monitoring their accounts to identify fraudulent or suspicious charges; (b) cancelling and reissuing cards; (c) purchasing credit monitoring and identity theft prevention services; (d) attempting to withdraw funds linked to compromised, frozen accounts; (e) removing withdrawal and purchase limits on compromised accounts; (f) communicating with financial institutions to dispute fraudulent charges; (g) resetting automatic billing instructions and changing passwords; (h) freezing and unfreezing credit bureau account information; (i) cancelling and re-setting automatic payments as necessary; (j) paying late fees and declined payment penalties as a result of failed automatic payments; and (k) and taking other measures as recommended by Caesars in the breach notification letter.

60.     Additionally, Plaintiffs and Class Members have suffered or are at increased risk of suffering from, *inter alia*, the loss of the opportunity to control how their PII is used, the diminution in the value or use of their PII, and the loss of privacy.

**V.  Securing PII and Preventing Breaches**

61.     Caesars could have prevented this Data Breach by properly securing and encrypting the PII of Plaintiffs and Class Members. Alternatively, Caesars could have destroyed the data they no longer had a reasonable need to maintain or only stored data in an Internet-accessible environment when there was a reasonable need to do so.

62.     Caesars' negligence in safeguarding the PII of Plaintiffs and Class Members is exacerbated by the repeated warnings and alerts directed to protecting and securing sensitive data.

63.     Despite the prevalence of public announcements of data breach and data security compromises, Caesars failed to take appropriate steps to protect the PII of Plaintiffs and Class Members from being compromised.

64.     The Federal Trade Commission ("FTC") defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority."[7] The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number."[8]

65.     The ramifications of Caesars's failure to keep secure the PII of Plaintiffs and Class Members are long lasting and severe. Once PII is stolen, particularly Social Security numbers, fraudulent use of that information and damage to victims may continue for years.

## VI.   The Value of PII

66.     It is well known that PII, and social security numbers and financial account information in particular, is an invaluable commodity and a frequent target of hackers.

67.     According to Javelin Strategy & Research, in 2017 alone over 16.7 million individuals were affected by identity theft, causing $16.8 billion to be stolen.[9]

68.     People place a high value not only on their PII, but also on the privacy of that data. This is because identity theft causes "significant negative financial impact on victims" as well as severe distress and other strong emotions and physical reactions.[10]

---

[7] 17 C.F.R. § 248.201 (2013).
[8] *Id*.
[9] Javelin Strategy & Research, *Identity Fraud Hits All Time High With 16.7 Million U.S. Victims in 2017, According to New Javelin Strategy & Research Study* (Feb. 6, 2018), https://www.javelinstrategy.com/press-release/identity-fraud-hits-all-time-high-167-million-us-victims-2017-according-new-javelin.

69.     People are particularly concerned with protecting the privacy of their financial account information and social security numbers, which are the "secret sauce" that is "as good as your DNA to hackers."[11] There are long-term consequences to data breach victims whose social security numbers are taken and used by hackers. Even if they know their social security numbers have been accessed, Plaintiffs and Class Members cannot obtain new numbers unless they become a victim of social security number misuse. Even then, the Social Security Administration has warned that "a new number probably won't solve all [] problems . . . and won't guarantee . . . a fresh start."[12]

70.     The PII of individuals remains of high value to criminals, as evidenced by the prices they will pay through the dark web. Numerous sources cite dark web pricing for stolen identity credentials. For example, personal information can be sold at a price ranging from $40 to $200, and bank details have a price range of $50 to $200.[13] Experian reports that a stolen credit or debit card number can sell for $5 to $110 on the dark web.[14] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[15]

71.     Social Security numbers, for example, are among the worst kind of personal information to have stolen because they may be put to a variety of fraudulent uses and are difficult for an individual to change. The Social Security Administration stresses that the loss of

---

[10] Identity Theft Resource Center, *Identity Theft: The Aftermath 2017*,
https://www.ftc.gov/system/files/documents/public_comments/2017/10/00004-141444.pdf.
[11] Cameron Huddleston, *How to Protect Your Kids From the Anthem Data Breach*, Kiplinger, (Feb. 10, 2015),
https://www.kiplinger.com/article/credit/T048-C011-S001-how-to-protect-your-kids-from-the-anthem-data-brea.html.
[12] Social Security Admin., *Identity Theft and Your Social Security Number*, at 6-7, https://www.ssa.gov/pubs/EN-05-10064.pdf.
[13] *Your personal data is for sale on the dark web. Here's how much it costs,* Digital Trends, Oct. 16, 2019,
https://www.digitaltrends.com/computing/personal-data-sold-on-the-dark-web-how-much-it-costs/.
[14] *Here's How Much Your Personal Information Is Selling for on the Dark Web*, Experian, Dec. 6, 2017,
https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.
[15] *In the Dark*, VPNOverview, 2019, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/.

an individual's Social Security number, as is the case here, can lead to identity theft and extensive financial fraud:

> A dishonest person who has your Social Security number can use it to get other personal information about you. Identity thieves can use your number and your good credit to apply for more credit in your name. Then, they use the credit cards and don't pay the bills, it damages your credit. You may not find out that someone is using your number until you're turned down for credit, or you begin to get calls from unknown creditors demanding payment for items you never bought. Someone illegally using your Social Security number and assuming your identity can cause a lot of problems.[16]

72.    What is more, it is no easy task to change or cancel a stolen Social Security number. An individual cannot obtain a new Social Security number without significant paperwork and evidence of actual misuse. In other words, preventive action to defend against the possibility of misuse of a Social Security number is not permitted; an individual must show evidence of actual, ongoing fraud activity to obtain a new number.

73.    Even then, a new Social Security number may not be effective. According to Julie Ferguson of the Identity Theft Resource Center, "The credit bureaus and banks are able to link the new number very quickly to the old number, so all of that old bad information is quickly inherited into the new Social Security number."[17]

74.    Based on the foregoing, the information compromised in the Data Breach is significantly more valuable than the loss of, for example, credit card information in a retailer data breach because, there, victims can cancel or close credit and debit card accounts. The information compromised in this Data Breach is impossible to "close" and difficult, if not impossible, to change.

---

[16] Social Security Administration, *Identity Theft and Your Social Security Number*, https://www.ssa.gov/pubs/EN-05-10064.pdf.
[17] Bryan Naylor, *Victims of Social Security Number Theft Find It's Hard to Bounce Back*, NPR (Feb. 9, 2015), http://www.npr.org/2015/02/09/384875839/data-stolen-by-anthem-s-hackers-has-millionsworrying-about-identity-theft.

75.    This data demands a much higher price on the black market. Martin Walter, senior director at cybersecurity firm RedSeal, explained, "Compared to credit card information, personally identifiable information and Social Security numbers are worth more than 10x on the black market."[18]

76.    Among other forms of fraud, identity thieves may obtain driver's licenses, government benefits, medical services, and housing or even give false information to police.

77.    The fraudulent activity resulting from the Data Breach may not come to light for years.

78.    There may be a time lag between when harm occurs versus when it is discovered, and also between when PII is stolen and when it is used. According to the U.S. Government Accountability Office ("GAO"), which conducted a study regarding data breaches:

> [L]aw enforcement officials told us that in some cases, stolen data may be held for up to a year or more before being used to commit identity theft. Further, once stolen data have been sold or posted on the Web, fraudulent use of that information may continue for years. As a result, studies that attempt to measure the harm resulting from data breaches cannot necessarily rule out all future harm.[19]

79.    At all relevant times, Caesars knew, or reasonably should have known, of the importance of safeguarding the PII of Plaintiffs and Class Members, including Social Security numbers, and of the foreseeable consequences that would occur if their data security system was breached, including, specifically, the significant costs that would be imposed on Plaintiffs and Class Members as a result of a breach.

---

[18] Time Greene, *Anthem Hack: Personal Data Stolen Sells for 10x Price of Stolen Credit Card Numbers*, IT World, (Feb. 6, 2015), https://www.networkworld.com/article/2880366/anthem-hack-personal-data-stolen-sells-for-10x-price-of-stolen-credit-card-numbers.html.
[19] *Report to Congressional Requesters*, GAO, at 29 (June 2007), https://www.gao.gov/assets/gao-07-737.pdf.

80. Plaintiffs and Class Members now face years of constant surveillance of their financial and personal records, monitoring, and loss of rights. Plaintiffs and Class Members are incurring and will continue to incur such damages in addition to any fraudulent use of their PII.

81. Caesars was, or should have been, fully aware of the unique type and the significant volume of data contained in the PII that Caesars stored unencrypted, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

82. The injuries to Plaintiffs and Class Members were directly and proximately caused by Caesars's failure to implement or maintain adequate data security measures for the PII of Plaintiffs and Class Members.

**VII. Industry Standards for Data Security**

83. In light of the numerous high-profile data breaches targeting companies like Target, Neiman Marcus, eBay, Anthem, Deloitte, Equifax, Marriott, T-Mobile, and Capital One, Caesars is, or reasonably should have been, aware of the importance of safeguarding PII, as well as of the foreseeable consequences of its systems being breached.

84. Security standards commonly accepted among businesses that store PII using the internet include, without limitation:

      a.      Maintaining a secure firewall configuration;

      b.      Monitoring for suspicious or irregular traffic to servers;

      c.      Monitoring for suspicious credentials used to access servers;

      d.      Monitoring for suspicious or irregular activity by known users;

      e.      Monitoring for suspicious or unknown users;

      f.      Monitoring for suspicious or irregular server requests;

      g.      Monitoring for server requests for PII;

h.  Monitoring for server requests from VPNs; and

i.  Monitoring for server requests from Tor exit nodes.

85.  The U.S. Federal Trade Commission ("FTC") publishes guides for businesses for cybersecurity[20] and protection of PII[21] which includes basic security standards applicable to all types of businesses.

86.  The FTC recommends that businesses:

a.  Identify all connections to the computers where you store sensitive information.

b.  Assess the vulnerability of each connection to commonly known or reasonably foreseeable attacks.

c.  Do not store sensitive consumer data on any computer with an internet connection unless it is essential for conducting their business.

d.  Scan computers on their network to identify and profile the operating system and open network services. If services are not needed, they should be disabled to prevent hacks or other potential security problems. For example, if email service or an internet connection is not necessary on a certain computer, a business should consider closing the ports to those services on that computer to prevent unauthorized access to that machine.

e.  Pay particular attention to the security of their web applications—the software used to give information to visitors to their websites and to retrieve information from them. Web applications may be particularly vulnerable to a variety of hacker attacks.

f.  Use a firewall to protect their computers from hacker attacks while it is connected to a network, especially the internet.

g.  Determine whether a border firewall should be installed where the business's network connects to the internet. A border firewall separates the network from the internet and may prevent an attacker from gaining access to a computer on the network where sensitive information is stored. Set access controls—settings that determine which devices and traffic get

---

[20] Start with Security: A Guide for Business, FTC (June 2015), https://www.ftc.gov/system/files/documents/plain-language/pdf0205-startwithsecurity.pdf.

[21] Protecting Personal Information: A Guide for Business, FTC (Oct. 2016), https://www.ftc.gov/system/files/documents/plain-language/pdf-0136_proteting personalinformation.pdf.

through the firewall—to allow only trusted devices with a legitimate business need to access the network. Since the protection a firewall provides is only as effective as its access controls, they should be reviewed periodically.

h.      Monitor incoming traffic for signs that someone is trying to hack in. Keep an eye out for activity from new users, multiple log-in attempts from unknown users or computers, and higher-than-average traffic at unusual times of the day.

i.      Monitor outgoing traffic for signs of a data breach. Watch for unexpectedly large amounts of data being transmitted from their system to an unknown user. If large amounts of information are being transmitted from a business' network, the transmission should be investigated to make sure it is authorized.

87.     The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect customer information, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the Federal Trade Commission Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.[22]

88.     Because Caesars was entrusted with PII, they had, and have, a duty to keep the PII secure.

89.     Plaintiffs and Class Members reasonably expect that when their PII is provided to a sophisticated business for a specific purpose, that business will safeguard their PII and use it only for that purpose.

90.     Nonetheless, Caesars failed to prevent the Data Breach. Had Caesars properly maintained and adequately protected its systems, it could have prevented the Data Breach.

---

[22] Federal Trade Commission, *Privacy and Security Enforcement: Press Releases*, https://www.ftc.gov/news-events/media-resources/protecting-consumer-privacy/privacy-security-enforcement.

## CLASS ALLEGATIONS

91.     This action is brought as a class action pursuant to Fed. R. Civ. P. 23.

92.     The proposed Class is defined as follows:

> **Nationwide Class:** All persons whose PII was maintained on Caesars's servers that were compromised in the Data Breach.

93.     The proposed Class excludes the following: Caesars, its affiliates, and its current and former employees, officers and directors, and the Judge assigned to this case.

94.     The proposed Class definition may be modified, changed, or expanded based upon discovery and further investigation.

95.     *Numerosity*: The proposed Class is so numerous that joinder of all members is impracticable, evidenced by the large number of individuals presently known to have been injured by Caesars' conduct. The proposed Class is ascertainable by records in the possession of Caesars or third parties.

96.     *Commonality*: Questions of law or fact common to the proposed Class include, without limitation:

> a.     Whether Caesars owed a duty or duties to Plaintiffs and Class Members to exercise due care in collecting, storing, safeguarding, and obtaining their PII;
>
> b.     Whether Caesars breached that duty or those duties;
>
> c.     Whether Caesars failed to establish appropriate administrative, technical, and physical safeguards to ensure the security and confidentiality of records to protect against known and anticipated threats to security;
>
> d.     Whether the security provided by Caesars was satisfactory to protect PII as compared to industry standards;
>
> e.     Whether Caesars misrepresented or failed to provide adequate information regarding the type of security practices used;

f.     Whether Caesars knew or should have known that it did not employ reasonable measures to keep Plaintiffs and Class Members' PII secure and prevent loss or misuse of that PII;

g.     Whether Caesars acted negligently in connection with the monitoring and protecting of Plaintiffs' and Class Members' PII;

h.     Whether Caesars's conduct was intentional, willful, or negligent;

i.     Whether Plaintiffs and Class Members suffered damages as a result of Caesars's conduct, omissions, or misrepresentations; and

j.     Whether Plaintiffs and Class Members are entitled to injunctive, declarative, and monetary relief as a result of Caesars' conduct.

97.     *Typicality*: Plaintiffs' claims are typical of the claims of proposed Class Members. Plaintiffs and proposed Class Members were injured and suffered damages in substantially the same manner, have the same claims against Caesars relating to the same course of conduct, and are entitled to relief under the same legal theories.

98.     *Adequacy*: Plaintiffs will fairly and adequately protect the interests of the proposed Class and have no interests antagonistic to those of the proposed Class. Plaintiffs' counsel are experienced in the prosecution of complex class actions, including actions with issues, claims, and defenses similar to the present case.

99.     *Predominance and superiority*: Questions of law or fact common to proposed Class Members predominate over any questions affecting individual members. A class action is superior to other available methods for the fair and efficient adjudication of this case because individual joinder of all members of the proposed Class is impracticable and the amount at issue for each proposed Class Member would not justify the cost of litigating individual claims. Should individual proposed Class Members be required to bring separate actions, this Court would be confronted with a multiplicity of lawsuits burdening the court system while also creating the risk of inconsistent rulings and contradictory judgments. In contrast to proceeding on

a case-by-case basis, in which inconsistent results will magnify the delay and expense to all parties and the court system, this class action presents far fewer management difficulties while providing unitary adjudication, economies of scale and comprehensive supervision by a single court. There are no known difficulties that are likely to be encountered in the management of this action that would preclude its maintenance as a class action.

100.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(3).

101.    Caesars has acted, and refused to act, on grounds generally applicable to the proposed Class, thereby making appropriate final equitable relief with respect to the proposed Class as a whole.

102.    Accordingly, this class action may be maintained pursuant to Fed. R. Civ. P. 23(b)(2).

<u>**CAUSES OF ACTION**</u>

<u>**COUNT I**</u>

**NEGLIGENCE**
**(on behalf of the Class)**

103.    All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

104.    Caesars owed a duty of care to Plaintiffs and Class Members to use reasonable means to secure and safeguard the entrusted PII, to prevent its unauthorized access and disclosure, to guard it from theft, and to detect any attempted or actual breach of its systems. These common law duties existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices. In fact, not only was it foreseeable that Plaintiffs and Class Members would be harmed by the failure to protect their PII because

hackers routinely attempt to steal such information and use it for nefarious purposes, but Caesars knew that it was more likely than not Plaintiffs and Class Members would be harmed by such exposure of their PII.

105.    Caesars' duties to use reasonable security measures also arose as a result of the special relationship that existed between Caesars, on the one hand, and Plaintiffs and Class Members, on the other hand. The special relationship arose because Caesars was entrusted with Plaintiffs' and Class Members' PII, Caesars accepted and held the PII, and Caesars represented that the PII would be kept secure pursuant to their data security policies. Caesars alone could have ensured that their data security systems and practices were sufficient to prevent or minimize the data breach.

106.    Caesars' duties to use reasonable data security measures also arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted and enforced by the FTC, the unfair practice of failing to use reasonable measures to protect PII. Various FTC publications and data security breach orders further form the basis of Caesars' duties. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

107.    Caesars' violations of Section 5 of the FTC Act constitute negligence per se.

108.    Caesars breached the aforementioned duties when it failed to use security practices that would protect Plaintiffs' and Class Members' PII, thus resulting in unauthorized third-party access to the Plaintiffs and Class Members' PII.

109.    Caesars further breached the aforementioned duties by failing to design, adopt, implement, control, manage, monitor, update, and audit their processes, controls, policies,

procedures, and protocols to comply with the applicable laws and safeguard and protect Plaintiffs and Class Members' PII within their possession, custody, and control.

110.    As a direct and proximate cause of failing to use appropriate security practices, Plaintiffs and Class Members' PII was disseminated and made available to unauthorized third parties.

111.    Caesars admitted that Plaintiffs and Class Members' PII was wrongfully disclosed as a result of the breach.

112.    The breach caused direct and substantial damages to Plaintiffs and Class Members, as well as the possibility of future and imminent harm through the dissemination of their PII and the greatly enhanced risk of credit fraud or identity theft.

113.    By engaging in the forgoing acts and omissions, Caesars committed the common law tort of negligence. For all the reasons stated above, Caesars' conduct was negligent and departed from reasonable standards of care including by, but not limited to: failing to adequately protect the PII; failing to conduct regular security audits; and failing to provide adequate and appropriate supervision of persons having access to Plaintiffs and Class Members' PII.

114.    But for Caesars' wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their PII would not have been compromised.

115.    Neither Plaintiffs nor the Class contributed to the breach or subsequent misuse of their PII as described in this Complaint. As a direct and proximate result of Caesars' actions and inactions, Plaintiffs and Class Members have been put at an increased risk of credit fraud or identity theft, and Caesars have an obligation to mitigate damages by providing adequate credit and identity monitoring services. Caesars is liable to Plaintiffs and Class Members for the reasonable costs of future credit and identity monitoring services for a reasonable period of time,

substantially in excess of two years. Caesars is also liable to Plaintiffs and Class Members to the extent that they have directly sustained damages as a result of identity theft or other unauthorized use of their PII, including the amount of time Plaintiffs and Class Members have spent and will continue to spend as a result of Caesars's negligence. Caesars is also liable to Plaintiffs and Class Members to the extent their PII has been diminished in value because Plaintiffs and Class Members no longer control their PII and to whom it is disseminated.

## COUNT II

**INVASION OF PRIVACY**
**(on behalf of the Class)**

116.   All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

117.   Plaintiffs and Class Members have objective reasonable expectations of solitude and seclusion in their personal and private information and the confidentiality of the content of PII.

118.   Caesars invaded Plaintiffs and Class Members' right to privacy by allowing the unauthorized access to their PII and by negligently maintaining the confidentiality of Plaintiffs and Class Members' PII, as set forth above.

119.   The intrusion was offensive and objectionable to Plaintiffs, the Class, and to a reasonable person of ordinary sensibilities in that Plaintiffs and Class Members' PII was disclosed without prior written authorization from Plaintiffs and Class Members.

120.   The intrusion was into a place or thing which was private and is entitled to be private, in that Plaintiffs and Class Members provided and disclosed their PII to Caesars privately with an intention that the PII would be kept confidential and protected from unauthorized disclosure. Plaintiffs and Class Members were reasonable to believe that such

information would be kept private and would not be disclosed without their written authorization.

121.    As a direct and proximate result of Caesars' above acts, Plaintiffs and Class Members' PII was viewed, distributed, and used by persons without prior written authorization and Plaintiffs and Class Members suffered damages as described herein.

122.    Caesars committed oppression, fraud, or malice by permitting the unauthorized disclosure of Plaintiffs and Class Members' PII with a willful and conscious disregard of their right to privacy.

123.    Unless and until enjoined, and restrained by order of this Court, Caesars' wrongful conduct will continue to cause Plaintiffs and Class Members great and irreparable injury in that the PII maintained by Caesars can be viewed, printed, distributed, and used by unauthorized persons. Plaintiffs and Class Members have no adequate remedy at law for the injuries in that a judgment for the monetary damages will not end the invasion of privacy for Plaintiffs and Class Members, and Caesars may freely treat Plaintiffs and Class Members' PII with sub-standard and insufficient protections.

## COUNT III

### BREACH OF IMPLIED CONTRACT
### (on behalf of the Class)

124.    Plaintiffs hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

125.    Caesars invited Plaintiffs and the Class to provide their PII to Caesars. As consideration for the benefits Caesars was to administer, Plaintiffs and the Class provided their PII to Caesars. When Plaintiffs and the Class provided their PII to Caesars, they entered into implied contracts by which Caesars agreed to protect their PII and only use it solely to administer

benefits. As part of the offer, Caesars would safeguard the PII using reasonable or industry-standard means.

126. Accordingly, Plaintiffs and the Class accepted Caesars's offer to administer benefits and provided Caesars their PII.

127. Plaintiffs and the Class fully performed their obligations under the implied contracts with Caesars. However, Caesars breached the implied contracts by failing to safeguard Plaintiffs' and the Class's PII.

128. The losses and damages Plaintiffs and the Class sustained that are described herein were the direct and proximate result of Caesars' breaches of its implied contracts with them. Additionally, because Plaintiffs and the Class continue to be parties to the ongoing administration and distribution of benefits under the contracts, and because damages may not provide a complete remedy for the breaches alleged herein, Plaintiffs and the Class are therefore entitled to specific performance of the contracts to ensure data security measures necessary to properly effectuate the contracts maintain the security of their PII from unlawful exposure.

129. Caesars' conduct as alleged herein also violated the implied covenant of good faith and fair dealing inherent in every contract, and it is liable to Plaintiffs and the Class for associated damages and specific performance.

## COUNT IV

### BREACH OF FIDUCIARY DUTY
**(on behalf of the Class)**

130. Plaintiffs hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

131. As alleged above, Plaintiffs and the Class had agreements with Caesars, both express and implied, that required Caesars to keep their PII confidential.

132.    The parties had a fiduciary relationship of trust and confidence such that Plaintiffs and the Class relied and depended on Caesars to securely maintain their highly sensitive PII, and Caesars had a duty of care to safeguard Plaintiffs and the Class's PII.

133.    Caesars breached that confidence by disclosing Plaintiffs' and the Class's PII without their authorization and for unnecessary purposes.

134.    As a result of the data breach, Plaintiffs and the Class suffered damages that were attributable to Caesars's failure to maintain confidence in their PII.

<u>**COUNT V**</u>

**UNJUST ENRICHMENT**
**(on behalf of the Class)**

135.    All preceding paragraphs are incorporated herein by reference as though fully set forth herein.

136.    Plaintiffs and Class Members have an interest, both equitable and legal, in their PII that was conferred upon, collected by, and maintained by Caesars and that was ultimately compromised in the data breach.

137.    Caesars, by way of their acts and omissions, knowingly and deliberately enriched itself by saving the costs it reasonably should have expended on security measures to secure Plaintiffs and Class Members' PII.

138.    Caesars also understood and appreciated that the PII pertaining to Plaintiffs and Class Members was private and confidential and its value depended upon Caesars maintaining the privacy and confidentiality of that PII.

139.    Instead of providing for a reasonable level of security that would have prevented the breach—as is common practice among companies entrusted with such PII—Caesars instead consciously and opportunistically calculated to increase its own profits at the expense of

Plaintiffs and Class Members. Nevertheless, Caesars continued to obtain the benefits conferred on it by Plaintiffs and Class Members. The benefits conferred upon, received, and enjoyed by Caesars were not conferred gratuitously, and it would be inequitable and unjust for Caesars to retain these benefits.

140.    Plaintiffs and Class Members, on the other hand, suffered as a direct and proximate result. As a result of Caesars' decision to profit rather than provide requisite security, and the resulting breach disclosing Plaintiffs and Class Members' PII, Plaintiffs and Class Members suffered and continue to suffer considerable injuries in the forms of, *inter alia,* attempted identity theft, time and expenses mitigating harms, diminished value of PII, loss of privacy, and increased risk of harm.

141.    Thus, Caesars engaged in opportunistic conduct in spite of its duties to Plaintiffs and Class Members, wherein it profited from interference with Plaintiffs and Class Members' legally protected interests. As such, it would be inequitable, unconscionable, and unlawful to permit Caesars to retain the benefits it derived as a consequence of its conduct.

142.    Accordingly, Plaintiffs and the Class respectfully request that this Court award relief in the form of restitution or disgorgement in the amount of the benefit conferred on Caesars as a result of its wrongful conduct, including specifically, the amounts that Caesars should have spent to provide reasonable and adequate data security to protect Plaintiffs and Class Members' PII, and compensatory damages.

### COUNT VI

**BAILMENT**
**(on behalf of the Class)**

143.    Plaintiffs hereby incorporates by reference all preceding paragraphs as though fully set forth herein.

144.    Plaintiffs and the Class provided, or authorized disclosure of, their PII to Caesars.

145.    In allowing their PII to be made available to Caesars, Plaintiffs and the Class intended and understood that Caesars would adequately safeguard their PII.

146.    For its own benefit, Caesars accepted possession of Plaintiffs' and the Class's PII.

147.    By accepting possession of Plaintiffs' and the Class's PII, Caesars understood that Plaintiffs and the Class expected Caesars to adequately safeguard their PII. Accordingly, a bailment (or deposit) was established for the mutual benefit of the parties. During the bailment (or deposit), Caesars owed a duty to Plaintiffs and the Class to exercise reasonable care, diligence, and prudence in protecting their personal information.

148.    Caesars breached its duty of care by failing to take appropriate measures to safeguard and protect Plaintiffs' and the Class's personal information, resulting in the unlawful and unauthorized access to and misuse of their PII.

149.    As a direct and proximate result of Caesars' breach of its duty, Plaintiffs and Class Members suffered consequential damages that were reasonably foreseeable to Caesars, including but not limited to the damages set forth above.

150.    As a direct and proximate result of Caesars' breach of its duties, the personal information of Plaintiffs and the Class entrusted, directly or indirectly, to Caesars during the bailment (or deposit) was damaged and its value diminished.

//

//

//

//

//

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for a judgment as follows:

a.  For an order certifying the proposed Class, appointing Plaintiffs as Class Representatives, and appointing the law firms representing Plaintiffs as counsel for the Class;

b.  For compensatory and punitive and treble damages in an amount to be determined at trial;

c.  Payment of costs and expenses of suit herein incurred;

d.  Both pre-and post-judgment interest on any amounts awarded;

e.  Payment of reasonable attorneys' fees and expert fees;

f.  Such other and further relief as the Court may deem proper.

## JURY DEMAND

Plaintiffs demand trial by jury.

Dated: December 9, 2023                    Respectfully submitted,

*/s/ Miles N. Clark*
Miles N. Clark
**LAW OFFICES OF MILES N. CLARK, LLC**
5510 S. Fort Apache Rd., Suite 30
Las Vegas, NV 89148-7700
T: (702) 856-7430
F: (702) 552-2370
miles@milesclarklaw.com

Jeffrey K. Brown, Esq. *
Andrew Costello, Esq. *
**LEEDS BROWN LAW, P.C**
One Old Country Road, Suite 347
Carle Place, NY 11514
Phone: (516) 873-9550
jbrown@leedsbrownlaw.com
acostello@leedsbrownlaw.com

Charles E. Schaffer *
Nicholas J. Elia *
**LEVIN SEDRAN & BERMAN LLP**
510 Walnut Street, Suite 500

Philadelphia, PA 19106
Phone: (215) 592-1500
cschaffer@lfsblaw.com
nelia@lfsblaw.com

Jeffrey S. Goldenberg *
**GOLDENBERG SCHNEIDER, LPA**
4445 Lake Forest Drive, Suite 490
Cincinnati, Ohio 45242
Phone: (513) 345-8291
Facsimile: (513) 345-8294
jgoldenberg@gs-legal.com
tnaylor@gs-legal.com

*Counsel for Plaintiffs and Proposed Class*

*\* Pro hac vice forthcoming*